# United States Court of Appeals

## For the First Circuit

No. 03-1312

PETER A. DORAN, individually and on behalf of
all others similarly situated; WENDY E. SAUNDERS;
individually and on behalf of all others similarly situated,

Plaintiffs, Appellants,

v.

MASSACHUSETTS TURNPIKE AUTHORITY;
MATTHEW AMORELLO; CHRISTY MIHOS; JORDAN LEVY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Torruella, Circuit Judge,

Howard, Circuit Judge,

and Schwarzer,* Senior District Judge.

Stephen V. Saia was on brief for appellants.
Joshua M. Davis, with whom James A. Aloisi, Jr. and
Peter N. Kochansky, was on brief for appellees.

November 6, 2003

*Of the Northern District of California, sitting by
designation.

**SCHWARZER, <u>Senior District Judge</u>.** Peter A. Doran and Wendy E. Saunders brought this action under 42 U.S.C. § 1983 against the Massachusetts Turnpike Authority, its chairman and members of its board (collectively, "MTA"). Plaintiffs complain that the FAST LANE Discount Program ("FLDP" or "program") established by MTA violates the dormant Commerce Clause of the United States Constitution. U.S. CONST. art. I, § 8, cl. 3. That program permits drivers of automobiles equipped with a transponder sold by MTA to pass through certain toll plazas and tunnels in the Boston area for a discounted toll which is electronically collected. Plaintiffs contend that the program discriminates against nonresidents of Massachusetts and does not serve a legitimate local interest. The district court dismissed the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted. It held that the FLDP did not discriminate against out-of-state residents and did not excessively burden interstate commerce. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343, and we have jurisdiction under 28 U.S.C. § 1291. For the reasons discussed below, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

In March 1997 Massachusetts Governor William Weld signed the Metropolitan Highway Systems bill authorizing MTA to increase tolls at the Allston-Brighton and Route 128 toll plazas from $.50

to $1.00, and at the Ted Williams Tunnel and the Sumner Tunnel from $2.00 to $3.00. The revenue from these toll increases would help finance Boston's Central Artery/Third Harbor Tunnel Project, commonly known as the "Big Dig." That project aims to bury stretches of Interstate 93 beneath the city and extend Interstate 90 to Logan International Airport. MTA is responsible for generating through tolls approximately $1.5 billion of the nearly $6 billion needed to complete work on the Interstate 90 segment.

The toll increase was scheduled to go into effect on January 1, 2002. In response to public opposition, MTA postponed the increase and proposed to implement a Resident Only Discount Program, under which state residents who drove automobiles equipped with FAST LANE transponders would receive toll discounts of $.25 at the Allston-Brighton and Route 128 toll plazas and $.50 at the tunnels.

The FAST LANE system allows vehicles equipped with a transponder to pass through toll plazas without having to stop and pay. Participants must purchase a transponder from MTA for $27.50. The transponder is a small plastic device attached to the windshield. It signals the car's identity to an MTA facility which automatically charges the toll to the driver's account. Drivers generally assign their account to their credit card which is billed $20 at the outset; thereafter, tolls are deducted until $10 remains, at which point an additional $10 is billed to replenish

-3-

the account.  Cars equipped with transponders used in other cities that—like the E-Z Pass system—are interoperable, may drive through FAST LANE toll gates without stopping, but do not receive discounts.[1]

Before the Resident Only Discount Program went into effect, a newspaper article questioned whether it violated the dormant Commerce Clause of the Constitution.  In response, MTA modified the program to apply to all drivers of automobiles, resident or not, equipped with FAST LANE transponders.  MTA's chairman noted that as a result a few thousand out-of-state FAST LANE subscribers, most of whom commute from Connecticut, would become eligible for discounts.

On July 4, 2002, plaintiff Doran drove through the Allston-Brighton and Route 128 toll plazas.  Doran is a Vermont resident who did not subscribe to the FLDP, so he paid the full tolls.  On July 5, plaintiff Saunders drove through the same toll plazas.  She is a New York resident who had an E-Z Pass but no FAST LANE transponder, so she also paid the full tolls.

Doran and Saunders then filed this action alleging that MTA's discount system violates the dormant Commerce Clause, and moved for a preliminary injunction.  Finding that the complaint

---

[1]E-Z Pass is the equivalent electronic toll payment system used by the State of New York.

failed to state a claim, the district court granted MTA's motion to dismiss.

## DISCUSSION

**I. STANDARD OF REVIEW**

We review "the grant of a motion to dismiss de novo, taking the allegations in the complaint as true and making all reasonable inferences in favor of plaintiff." Rockwell v. Cape Cod Hosp., 26 F.3d 254, 255 (1st Cir. 1994). However, we are not required to accept legal conclusions. New England Cleaning Servs. v. American Arbitration Ass'n, 199 F.3d 542, 545 (1st Cir. 1999). A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) should succeed only when "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegation." Gorski v. New Hampshire Dep't of Corr., 290 F.3d 466, 473 (1st. Cir. 2002) (citing Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)).

**II. THE MERITS**

The Commerce Clause of the United States Constitution grants Congress the power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. The Commerce Clause "not only grants Congress the authority to regulate commerce among the States, but also directly limits the power of the States to discriminate against interstate commerce." New Energy Co. v. Limbach, 486 U.S. 269, 273 (1988). This "dormant" Commerce Clause

-5-

"prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." Id. We must decide whether plaintiffs have stated a claim that the FLDP offends the dormant Commerce Clause.

Plaintiffs advance four contentions in support of their claim:

1) That the FLDP imposes a nonuniform and noncompensatory user fee unrelated to actual highway usage;

2) That it is discriminatory on its face or in practical effect;

3) That it does not serve a legitimate local interest unrelated to economic protectionism; and

4) That its cumulative effects on commerce, by shifting highway costs to nonresidents, are excessive. Appellants' Br. at 9.

We address each of these contentions in turn.[2]

A.      The FLDP Does Not Impose a
        Nonuniform and Noncompensatory
        User Fee

Plaintiffs argue that the FLDP violates the Commerce Clause because it does not charge every user the same amount for identical use and because the discount is nonuniform,

_____

[2]Because we find other arguments to fully support MTA's position, we do not address the market participant issue. MTA contends that the dormant Commerce Clause does not even apply to this case because of the market participant exception. See Reeves, Inc. v. Stake, 449 U.S. 429 (1980).

-6-

noncompensatory and unrelated to actual highway usage or to specific services provided by MTA. To begin with, the argument is factually flawed. The FLDP is available on identical terms to drivers without regard to their residence; the program incorporates no distinctions or classifications based on residence and participation is open to anyone. The benefits of the discount program accrue simply on account of a driver's frequency of use. The frequent driver will receive a greater amount of discounts than the infrequent driver, but he or she will, of course, also pay a correspondingly greater amount in tolls.

It is true that to participate in the FLDP, a driver must purchase a transponder for $27.50. The right to purchase is not restricted to residents, but is open to all. The decision whether to do so turns on one's anticipated frequency of use. The distance a driver lives from Boston will be a factor, but not the only factor, affecting the frequency with which he or she is likely to drive through the toll plazas or the tunnels. But the frequency calculus creates no resident versus nonresident classification. The geographical reality is that a commuter from Providence, RI or Manchester, NH is no more distant from Boston than one from Worcester, MA; a commuter from Hartford, CN or Portland, ME is no further from Boston than one from Springfield, MA; and residents of cities in Western Massachusetts such as Pittsfield are further than residents of any of these major out-of-state population centers.

Thus, plaintiffs' claim that MTA "charg[es] millions of non-residents a higher cost per mile for traveling the exact same distance," Appellants' Br. at 10, is pure fiction. The toll is higher for nonparticipants than for participants, regardless of where they live. Thus, many infrequent nonparticipating drivers living in and around Boston will pay a higher toll for whatever distances they may drive than commuters from, say, Manchester, Providence or Portland who have chosen to participate.

Plaintiffs rely principally on American Trucking Ass'n v. Scheiner, 483 U.S. 266 (1987), to support their argument. That case involved the validity of flat taxes imposed on trucks. Pennsylvania first required owners of trucks operating on its roads to purchase an identification marker. For vehicles not registered in Pennsylvania the fee was $25, while owners of vehicles registered in Pennsylvania were not required to pay the fee. Later, Pennsylvania reduced the marker fee to $5 and instituted an axle tax on all trucks above a certain weight. At the same time, it reduced the registration fee for in-state trucks in an amount identical to the new axle tax, thereby eliminating the effect of the axle tax on in-state vehicles. These flat taxes were assessed annually without regard to the number of miles traveled on Pennsylvania roads. Id. at 274-75, 281-82.

The Court stated that the issue was whether the methods by which the flat taxes are assessed discriminate against some participants in interstate commerce and held:

> We find dispositive those of our precedents which make clear that the Commerce Clause prohibits a State from imposing a heavier tax burden on out-of-state businesses that compete in an interstate market than it imposes on its own residents who also engage in commerce among States.

Id. at 282. Although the Court's discussion in Scheiner largely focuses on the validity of an unapportioned flat tax on trucks, the decision rests on the premise that the imposition of the Pennsylvania tax did not treat interstate and intrastate interests evenhandedly. Thus, the case is not apposite. The FLDP does not impose a heavier burden—toll or otherwise—on out-of-state residents. Plaintiffs' discussion of the Court's analysis of potential defenses of the Pennsylvania scheme and, in particular, the user fee defense, is therefore not relevant. The Court's rejection of that defense—based on the fact that Pennsylvania's taxes discriminate against out-of-state vehicles—affords no support to plaintiffs' claim that MTA's nondiscriminating program violates the Commerce Clause.

Moreover, the FLDP bears no resemblance to Pennsylvania's flat tax. As plaintiffs argue, the Pennsylvania tax imposed for the privilege of using Pennsylvania roads discriminated because that privilege was more valuable to residents than nonresidents. The

tolls in issue here, in contrast, are imposed on a per-use basis. They are imposed only when the driver actually uses the toll plazas or tunnels and are directly proportional to that use. As the Scheiner court put it, "[s]o long as a State bases its tax on a relevant measure of actual road use, obviously both interstate and intrastate [drivers] pay according to the facilities in fact provided by the State," and the program places no undue burden on interstate commerce. See id. at 291 (quoting Capitol Greyhound Lines v. Brice, 339 U.S. 542, 557 (1950) (Frankfurter, J., dissenting)).

Even if we were to treat these highway tolls as analogous to a flat tax, as plaintiffs appear to argue, MTA "treat[s] [in-state and out-of-state] vehicles with an even hand." See id. at 282. Tolls are the same for both kinds of vehicles and each is eligible to participate in the discount program. That the incentive to participate varies across drivers does not make the program discriminatory. That incentive "affects local and out-of-state vehicles in precisely the same way, and thus does not implicate the Commerce Clause." Id. at 283 n.15. Thus, contrary to plaintiffs' contention, the program does not fail Scheiner's internal consistency test. Appellants' Br. at 22. As the Court put it, if more than one state adopted a similar discount program, the Commerce Clause is satisfied where the programs would "maintain state boundaries as a neutral factor in economic decision making." Id.

at 282-83; <u>see also</u> <u>id.</u> at 284 ("To pass the 'internal inconsistency' test, a state tax must be of a kind that, 'if applied by every jurisdiction, there would be no impermissible interference with free trade.'"); <u>American Trucking Ass'n, Inc.</u> v. <u>Sec'y of Admin.</u>, 613 N.E.2d 95, 102 (Mass. 1993) (stating that "[a] valid user fee will pass the internal consistency test because the full measure of the fee is not imposed for merely crossing the taxing State's border, but is directly related in purpose and amount, to the use of a service or privilege.")

We think that the case before us is more akin to <u>Evansville-Vanderburgh Airport Auth.</u> v. <u>Delta Airlines, Inc.</u>, 405 U.S. 707 (1972), which upheld the validity of a flat charge of $1.00 per passenger enplaning on a commercial airliner operating from the Evansville airport. The Court held that because both interstate and intrastate flights are subject to the same charge, the fee did not discriminate against interstate commerce, even though the vast majority of passengers boarding aircraft traveled in interstate commerce. It stated that

> so long as the toll is based on some fair approximation of use or privilege for use, as was that before us in <u>Capitol Greyhound [Lines v. Brice</u>, 339 U.S. 542 (1950)], and is neither discriminatory against interstate commerce nor excessive in comparison with the governmental benefit conferred, it will pass constitutional muster, even though some other formula might reflect more exactly the relative use of the state facilities by individual users.

Id. at 716-17. In Capitol Greyhound, cited by the Court, it had upheld the validity of Maryland's excise tax of 2% of the value of a vehicle imposed as a condition precedent to operation of the vehicle in the State of Maryland, in part because the tax "applie[d] to interstate and intrastate commerce without discrimination." 339 U.S. at 544.

Here, the tolls are assessed uniformly in direct proportion to use of the toll facilities and have not been shown to be excessive, either standing alone or by reason of the unrestricted availability of the frequent traveler discount.

B.     The FLDP Is Not Discriminatory
       On Its Face Or In Its Practical
       Effect

Plaintiffs offer three arguments in support of their second contention. First, they say that the FLDP "invariably result[s] in a significant degree of permanent cost exporting onto the interstate traveler, non-resident and/or non-participant." Appellants' Br. at 29. As we have explained above, interstate travelers pay the same tolls as resident travelers. Any traveler can qualify for a discount but the decision whether to do so turns principally on anticipated frequency of travel. While a New York resident is likely to make infrequent trips through the toll plazas and tunnels, so is the resident of a "wealthy suburb of Boston" who prefers using public transportation to driving his or her car into the city. Appellants' Br. at 32. But the incremental burden of the

undiscounted toll for the infrequent traveler is by necessity de minimus. Plaintiffs' inflammatory assertion that "[e]ach year millions of non-FASTLANE participants pay a significant toll premium, a tariff of 20% or 33% greater than participants (i.e. Massachusetts residents), for using the same stretch of road," Appellants' Br. at 14, proves nothing; it is expected that nonparticipants will pay higher tolls but it does not follow that interstate commerce will be burdened, much less that it will suffer discrimination. Unlike flat taxes imposed on interstate truck operators, the collection of undiscounted tolls from the occasional traveler—resident or non-resident—results in no discernable "cost exporting."

Second, they argue that the FLDP has a discriminatory intent and purpose. Plaintiffs point out that the FLDP was adopted in response to political pressure to benefit commuters, surely a constitutionally valid purpose. Appellants' Br. at 31. They go on to argue that when MTA sought to quell constitutional concerns by offering discounted tolls to nonresidents who participate in the FLDP, it merely "sought to mask the discriminatory impact on non-residents by offering a hollow option that few non-residents will choose." Appellants' Br. at 32.

However, plaintiffs' First Amended Complaint contains no allegation of discriminatory purpose; on the contrary, plaintiffs allege that

> to head off concerns that the Resident Only
> Fast Lane Discount Program may violate the
> interstate Commerce Clause . . . defendants
> modified the Resident Only Discount Program to
> apply to all travelers, residents and non-
> residents, equipped with FAST LANE
> transponders.

First Am. Compl. at ¶ 27. We think that plaintiffs' argument falls of its own weight. See Grant's Dairy v. Comm'r of Me. Dep't of Agric., 232 F.3d 8, 23 (1st Cir. 2000) (innocuous expressions of concern insufficient to raise inference of protectionist intent).

Finally, plaintiffs contend that the FLDP is discriminatory on its face

> because it regulates the toll that one pays
> based on one's participation in the state
> sponsored FASTLANE electronic toll collection
> program to the exclusion of all other competing
> electronic toll collection systems like E-Z
> Pass offered by other states or that do not
> participate in any electronic toll collection
> system.

Appellants' Br. at 33. The logic underlying the argument is elusive. Participation in FAST LANE does not preclude participation in other electronic toll collection systems; nothing in the record indicates that automobiles cannot carry more than one transponder. Moreover, it can hardly be said that FAST LANE, which operates on three Massachusetts toll collection points, competes with systems that operate on toll collection points in New York, New Jersey and Delaware. Participants in systems in those states are not "penalized," as plaintiffs argue, for their decision to choose a different system. Appellants' Br. at 33. Their participation in

-14-

such systems has no impact on their right to participate in the FLDP.

>C.      The FLDP Does Not Shift Highway Costs To Non-Residents and Serves A Legitimate Local Interest Unrelated To Economic Protectionism

We address plaintiffs' third and fourth contentions together.  Arguing from the premise that the FLDP redistributes the increased toll burden from Boston commuters to nonresidents and forces nonresidents "with little or no incentive to participate to pay a disproportionate share of the state's highway costs," plaintiffs contend that the FLDP serves no legitimate local interest unrelated to economic protectionism.  Appellants' Br. at 38.  For the reasons discussed at length above, the premise is flawed.  There is nothing to show that one who drives from New York to Boston and pays the $1.00 toll pays a "disproportionate share of the state's highway costs" compared to the suburban commuter who, driving over a much shorter distance on the state's highways, pays the discounted toll of $.75.  Thus, the program does not implicate the balancing test under Pike v. Bruce Church, 397 U.S. 137 (1970).  See Appellants' Br. at 40.

Even if it did, however, the plan passes muster.  Under the Pike balancing test, "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be

-15-

upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Id. at 142. Here, the effect on nonresident drivers—just as on resident drivers—is that to qualify for the discounts, they must invest $27.50 to acquire a transponder and maintain an account balance of $10-$20. That burden is de minimis in relation to the public benefits of achieving a more equitable sharing of toll burdens among commuters, some of whom pay no tolls on their routes, and facilitating the implementation of an essential funding scheme for major highway improvements.

We have considered other arguments advanced by plaintiffs and found them to be without merit.

### CONCLUSION

We conclude that the FLDP treats Massachusetts-based and other vehicles with an even hand and that the program does not interfere with commerce between the states. Accordingly, the judgment of the district court is **AFFIRMED.**

**AFFIRMED.**