# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 8, 2016        Decided March 1, 2016

No. 14-7206

AMERICAN COUNCIL OF LIFE INSURERS,
APPELLANT

v.

DISTRICT OF COLUMBIA HEALTH BENEFIT EXCHANGE
AUTHORITY, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-01138)

———

*Paul D. Clement* argued the cause for appellant. With him on the briefs were *Erin E. Murphy* and *Barbara Smith Grieco*.

*Loren L. AliKhan*, Deputy Solicitor General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With her on the brief were *Karl A. Racine*, Attorney General, *Todd S. Kim*, Solicitor General, and *Stacy L. Anderson*, Senior Assistant Attorney General.

Before: TATEL and PILLARD, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: The District of Columbia's Health Benefit Exchange Authority (the "Authority"), created under the Patient Protection and Affordable Care Act, Pub. L. No. 111-148 (March 23, 2010), faced a funding shortfall for at least the period immediately after its opening in 2014. To cover the shortfall, the Authority, with emergency authorization from the District's Council, levied a charge on all insurance policies above a certain premium threshold sold by health carriers in the District—including products, such as long-term care insurance, that insurers cannot trade on the exchange. The American Council of Life Insurers raises several statutory and constitutional challenges to that charge on behalf of insurers whose products are not sold on the Authority's exchange but who as a result of the charge are forced to bear its operating costs.

The district court rejected the Council's statutory and constitutional arguments and dismissed the plaintiff's complaint for failure to state a claim. *American Council of Life Insurers v. D.C. Health Benefit Exchange Authority*, 73 F. Supp. 3d. 65 (D.D.C. 2014). On appeal, the District argues, contrary to its position in the district court, that the district court lacked jurisdiction to hear this case because the charge levied by the Authority was a tax rather than a fee. We agree.

\* \* \*

Congress has vested the Tax Division of the D.C. Superior Court with exclusive jurisdiction over challenges to taxes imposed by the District. D.C. Code § 11-1201 (granting exclusive jurisdiction); *id.* § 11-1202 (abolishing other remedies). This court has removed any doubt that such

jurisdiction is exclusive, even over suits seeking relief from District taxes on federal statutory or constitutional grounds. *Jenkins v. Wash. Convention Ctr.*, 236 F.3d 6, 11 (D.C. Cir. 2001). Since we have an "independent obligation to assure ourselves of jurisdiction," *Floyd v. District of Columbia*, 129 F.3d 152, 155 (D.C. Cir. 1997), we must decide whether the charge levied by the Authority is a tax, even though both parties agreed in the district court that it was not. Appellee Br. 20.

There are no federal cases interpreting Congress's grant of exclusive jurisdiction to the District's courts, so in distinguishing between a tax and a fee we must look to out-of-circuit cases, principally those interpreting the most closely analogous provision, the Tax Injunction Act, 28 U.S.C. § 1341. That act bars the federal district courts from granting injunctive or declaratory relief in suits challenging taxes imposed by the states.

The circuits interpreting the Tax Injunction Act have agreed in saying that the basic issue is "whether the charge is for revenue raising purposes, making it a 'tax,' or for regulatory or punitive purposes, making it a 'fee.'" *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000) (citation omitted). Of course, all charges raise revenue (at least if we put aside possible adverse effects on other revenue streams), so that formulation sheds little light. We believe that in practice the key question is whether a charge raises revenue merely to cover the cost of offering a service to the payers of the fee (including financing regulatory systems applicable to them), or whether it also raises revenue for purposes that aren't especially beneficial or useful to the payers, or required for pursuit of their businesses. In other words, the hallmark of a fee is at least a rough match between the sum paid and the (broadly defined) benefit provided, as seen from the payers' perspective. If, for example, "the fee is

a reasonable estimate of the cost imposed [on the agency] by the person required to pay the fee, then it is a user fee." *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 651 F.3d 722, 728 (7th Cir. 2011) (en banc) (quoting *Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388, 1399 (7th Cir. 1992)). Similarly, a close correlation between the payers' burdens under the charge and their benefits from its application signals a fee; indeed, this can be viewed as substantially equivalent to *Empress Casino*'s "cost" formulation.

In drawing the tax-fee distinction, courts have commonly invoked three "factors," which seem to overlap both with each other and with the criterion we've identified as central. First, a charge is more likely a tax if levied by the legislature than if imposed by an administrative agency. *Valero*, 205 F.3d at 134. Second, the broader the population on which the charge falls, the more likely it is to be considered a tax. *Id.* Third, the wider the use of the revenue raised by the charge, and the more it "benefits the general public," the more likely the charge is a tax, *id.*, though in some cases this third criterion is formulated in terms more directly linked to the benefit-burden match. See, e.g., *Bidart Bros. v. California Apple Commission*, 73 F.3d 925, 931 (9th Cir. 1996) (contrasting a charge with such a broad public benefit with a charge "used for the regulation or benefit of the parties upon whom [it] is imposed").

Indeed, the second and third factors seem like separate halves of what we have suggested is central. They focus on the breadth of, respectively, the payer base and the benefitted group. Where the two are narrow, and *match each other*, the charge looks like a fee. In rare cases it may be that breadth on both sides is more critical than match-up; classification of the Social Security "tax" as such, notwithstanding a fairly close match of burdens and actuarially expected benefits, suggests

as much.  See, e.g., *Bob Jones University v. Simon*, 416 U.S. 725, 727, 739-40 (1974).

We particularly emphasize the correspondence between payment and benefit because it fits the jurisdictional rule's purpose: to prevent federal courts from disrupting state government functions by removing their sources of revenue. When payers receive a benefit in exchange for a charge, they will have less incentive to raise meritless or marginal challenges.  And when such challenges are brought, they will disrupt only the provision of the services that the charge finances, not the more general operations of government. Thus lawsuits challenging fees, even when not channeled to particular courts, are less likely to "derange the operations of government."  *Empress Casino*, 651 F.3d at 726 (quoting *Dows v. City of Chicago*, 78 U.S. (11 Wall.) 108, 110 (1871)).

It may seem anomalous that the very characteristic that the plaintiff life insurer group identifies as offensive about the charge in question here—that the payers receive none of the benefit—militates in favor of classifying it as a tax and therefore places their federal-law challenges outside the jurisdiction of an ordinary federal court.  But that apparent offensiveness of course breeds the likely readiness of an assessed party to start litigation, which the jurisdictional provision seeks to channel to a specially chosen court.

The cases confirm that when benefit and burden do not at least roughly correspond, a charge is a tax.  For example, the Seventh Circuit labeled as a tax a charge that collected revenue from riverboat casinos and transferred it to a segregated fund benefiting horse racetracks.  *Empress Casino*, 651 F.3d at 724-25.  By contrast, where funds are collected from regulatees to cover the costs of regulation, courts have categorized the charges as fees.  In *Trailer Marine Transp. Corp. v. Rivera Vazquez*, 977 F.2d 1, 4-6 (1st Cir. 1992), for example, an assessment for participation in a

compulsory no-fault compensation scheme was held a fee despite its broad benefits because of the symmetry between payers and beneficiaries. The assessment was "collected only from those seeking the privilege of driving on state highways, and [was] proportioned (for motor vehicles as a class) to compensate victims for specified damage resulting from that activity." *Id.* at 6. A similar match between payment and benefit was present in *San Juan Cellular Telephone Co. v. Public Service Commission of Puerto Rico*, 967 F.2d 683, 686 (1st Cir. 1992), where the First Circuit considered a charge on private cell phone providers, mainly to cover the Puerto Rico Public Service Commission's expenses in regulating those firms. The court thought it made little difference whether the match-up was firm-by-firm or for a class of firms, *id*. at 687, and hewed to the classification of the charge as a fee despite a provision allowing unused revenue to be diverted to Puerto Rico's general fund, so long as "large amounts of the revenue" were not so diverted, *id*.

The plaintiffs here receive no immediate benefit in exchange for their payment of the charge. Like the riverboat casino operators in *Empress Casino*, they provide revenue that is simply redistributed to the exchange, perhaps benefiting the insurers that use the exchange—but not the plaintiffs. Moreover, the match between benefit and payment is poor even if we consider all the payers of the fee, rather than just the plaintiffs here. If the Authority had chosen to levy a charge only on insurance plans traded on the exchange, raising the necessary revenue would have required a charge of over 3% of each premium, even accepting the lowest projection (from 2013) for 2016. Joint Appendix 47. By assessing nonparticipating insurance plans, the Authority was able to levy under 1% of each premium. *Id.* at. 48. In other words, the majority of the funds raised by the charge come from premiums for policies not traded on the exchange. Such redistribution of resources marks the charge as a tax.

We have largely neglected the first factor that courts purport to invoke for drawing the line between taxes and fees—the enacting body (legislature or agency). Of course this consideration is necessarily somewhat elusive, as a charge adopted by an agency would be invalid if it were not authorized by the relevant legislative body. Here the legislature directed the Authority to assess the charge as a percentage of insurers' premium receipts, D.C. Act 20-329 (May 22, 2014), but left the choice of actual rate to the Authority so long as it was calculated to yield no more than "reasonable projections regarding the amount necessary to support the operations of the Authority," D.C. Code § 31-3171.03(f)(2). The charge thus falls somewhere between a tax and a fee for these purposes, and the first factor would not strongly affect our analysis even if we regarded it as on a par with the benefit-burden match criterion.

Finally, the plaintiffs note that the D.C. City Council itself declined to call its charge a tax, instead labeling it an "assessment." D.C. Code § 31-3171.03(f). That label, however, "has nothing to do with any concern behind the Tax Injunction Act," *Empress Casino*, at 651 F.3d at 730, or behind the District's analogous provision.

Since the assessment is a tax, we vacate the district court's judgment for lack of jurisdiction and remand with instructions to dismiss the case for lack of jurisdiction.

*So ordered*.